COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS





UNIT 82 JOINT VENTURE, 
FIVE STAR HOLDING COMPANY,
INC., FIVE STAR HOLDING
MANAGEMENT, L.L.C., and 
1320/1390 DON HASKINS, LTD.,

                                    Appellants,

v.

MEDIACOPY TEXAS, INC., 
A DELAWARE CORPORATION and
INFODISC GLOBAL HOLDING, INC., 
A DELAWARE CORPORATION,

                                    Appellees. 

§
 
§
 
§
 
§
 
§

§

§

§

§


No. 08-08-00159-CV

Appeal from
 327th District Court

of El Paso County, Texas

(TC # 2005-1987)



 

 

 




O P I N I O N

            The parties disagree about the very nature of this case. Appellants describe it as a
receivership case involving a property owner’s claims for loss of property, damages to its property,
and recovery in quantum meruit of the rental value of its commercial warehouse, noting that the jury
found $3,500,000 in damages caused by the receiver. Appellees counter that, “long story short, this
is really just a disgruntled landlord who doesn’t like being relegated to the status of a mere claimant. 
He wants to be able to . . . get money that he wouldn’t be otherwise entitled to because he is afraid
he is not going to get it from his tenant who is in bankruptcy.” Aye, there’s the rub.



FACTUAL SUMMARY
            We begin by identifying the parties. Five Star Holding Company, Inc. owns a 200,000 square
foot warehouse (the Premises) located at 1390 Don Haskins in El Paso. A separate entity--
1320/1390 Don Haskins Ltd.--owns the lease for the Premises. Jerry Ayoub is the president of Five
Star, the manager of Five Star Holding Management, L.L.C., and an authorized representative of
1320/1390 Don Haskins Ltd. For clarity, we will refer to Appellants collectively as Landlord. In
1997, Landlord leased the Premises to Mediacopy, Inc., a California corporation, spending nearly
$3.8 million to finish out the warehouse to the tenant’s specifications. Under the terms of the lease,
the tenant was required to replace any broken or removed equipment, fixtures, or appurtenances to
the building with equipment, fixtures and appurtenances of substantially the same quality. The
tenant was also required to repair all damages arising from replacement. The original lease was
modified in May 1998, July 2000, and October 2000. At no time did Mediacopy, Inc. sublease the
Premises. 
            Mediacopy, Inc. and Mediacopy Texas, Inc. (MTI) are subsidiaries of Infodisc Global
Holdings, Inc., which in turn is a wholly owned subsidiary of Infodisc Technology Co., Ltd. MTI
and Infodisc Global are Delaware corporations. These companies manufactured and replicated DVD
and videotaped recordings of movies, television programming, specialty films, and other types of
entertainment and informational programming. The record is unclear precisely when MTI began
utilizing the Premises, but the company did lease nearby property from Landlord. 
 

Bank Loans and Bankruptcy
            On August 28, 2003, MTI and Infodisc Global entered into a security agreement and credit
agreement with International Commercial Bank of China (ICBC). Two weeks later, on September
12, MTI and Infodisc Global executed six promissory notes totaling $16,560,000. These loans were
secured by a lien on all machinery, equipment, and fixtures located at various locations of operation,
including the Premises in El Paso. On September 12, 2004, MTI and Infodisc Global defaulted on
the loans. Mediacopy, Inc. filed a Chapter 11 bankruptcy petition in the United States Bankruptcy
Court for the Central District of California on October 22, 2004. Attached to the petition was a
tenant estoppel certificate evidencing that Infodisc Global is a corporation “d/b/a Mediacopy, a
California corporation.” Landlord was duly listed as a creditor. Oddly, the bankruptcy was
dismissed on December 5, 2005, for “failure to appear at 341 meeting for the second time.” 
The California Receivership Order
            On November 30, 2004--during the pendency of the bankruptcy proceedings--ICBC sued
MTI and Infodisc Global in California state court and sought a receivership for the purpose of
liquidating the collateral. It also sued “Does 1 through 100” whose true names and capacities--whether individual, corporate, or associate--were unknown but were believed to be responsible either
contractually or tortiously. Landlord was not notified of this proceeding. On January 13, 2005, the
California state court appointed Robb Evans as Receiver. Reciting an agreement between ICBC,
MTI, and Infodisc Global to liquidate all of the assets, the California receivership order required the
Receiver to seize and sell the assets of MTI and Infodisc Global at its business locations in
California, Nevada, Texas, and Canada. Landlord’s Premises at 1390 Don Haskins were specifically
mentioned. On March 29,2005, the California court approved Maynards Industries, Ltd.
(Auctioneer) as the Receiver's agent to liquidate the assets. Although the Receiver claimed under
oath to have prepared an inventory of MTI’s assets, an agent from Maynards testified that he--not
Robb Evans--directed two former employees of MTI to update an inventory previously prepared by
MTI.
The Texas Receivership Order
            To sell the receivership assets, ICBC sought and obtained an ancillary receivership in the
327th Judicial District Court of El Paso County, Texas on March 24, 2005. Landlord received no
notice, although the assets were located on his property. Judge Linda Chew appointed Robb Evans
as the Ancillary Receiver. Auctioneer and the Receiver then arranged for a private sale and public
auction in accordance with the California and Texas receivership orders. The auction was scheduled
for June 14-15.
Petition in Intervention
            On June 1, 2005, Landlord filed an original petition in intervention and sought a temporary
restraining order to prevent the private sale and public auction. At the hearing, counsel for Landlord
advised the court that although Mediacopy was the lessee, Landlord had recently learned that all of
the personalty within the warehouse allegedly belonged to MTI:
[Mr. Haugland]: Mediacopy, Inc. Was [sic] converted to a Chapter 7 bankruptcy on
Tuesday of this week. We have asked them to abandon these leasehold premises and
we are anticipating that that will happen any day now.
 
Mediacopy, Inc. Has [sic] no assets, no business operations, no nothing. But they
have been utilizing that bankruptcy to prevent my client the landlord from exercising
his landlord rights in Texas relative to this property where all of the apparent physical
assets of the operation have been housed for the last several months. . . . [M]y
clients have been sitting back there trying to negotiate with the bank the receiver [sic]
about what can be removed from the premises, who is going to be responsible for the
damages to the property, what stays, what goes. And the problem we’ve had, Your
Honor, is my client is not being allowed access to the property. So we don’t know
what’s being removed but my client put more than a million dollars of tenant
improvements into this property for this tenant and under Texas law, those
improvements stay with the property rather than go. 

             The trial court denied the restraining order and instructed the Receiver to move forward with
the sale.


 Although Landlord was ordered not to interfere with the pre-sales or auction of assets, the
trial court allowed it to identify and photograph the assets it claimed to own so that ownership could
be determined after the sale. Liquidation of the assets netted $7,573,896.46. The Receiver vacated
the premises on July 27, 2005. ICBC took a default judgment against MTI and Infodisc Global on
August 29, 2005. 
            By written scheduling order, Judge Chew set January 13, 2006 as the deadline for creditors
to file proof of claims. Appellants filed two Proof of Claims on January 13, 2006. The first sought 
$3,650,036.86, which consisted of a claim for demolition, clean-up and repair costs ($1,150,036.86)
plus a claim for $2,500,000 for assets sold by the Receiver to which Landlord claimed ownership. 
The second proof of claim related to rent. Landlord contended its claims were administrative priority
claims to be paid from the receivership estate ahead of other general secured and unsecured claims. 
Both the Receiver and the ICBC objected. These filings were later amended, increasing the claims
to $4,491,517.90. 
Personal Liability Causes of Action
            Landlord also amended its petition to allege personal liability causes of action against the
Receiver and Auctioneer, including conversion, negligence, gross negligence, and violations of the
Texas Theft Liability Act. Shortly before trial, Landlord added ICBC as a defendant and alleged
personal liability causes of action for (1) conspiracy between ICBC, the Receiver and the Auctioneer,
(2) misappropriation of fiduciary property against the Receiver and the Auctioneer, and (3) breach
of fiduciary duty against the Receiver. The actual damages sought totaled the same amount alleged
in the amended proof of claims ($4,491,517.90). The trial court severed the conspiracy claim. It also
granted partial summary judgment for the Receiver and the Auctioneer, finding that Landlord’s
personal liability claims against them were barred by derived judicial immunity, and that any
recovery based on its proof of claims would be limited to funds held in the liquidated receivership
estate. 
Pretrial Determination of Ownership
            On February 26, 2008, the trial court conducted a hearing concerning Landlord’s ownership
rights to assets on the Premises. Counsel for ICBC cautioned that Landlord was merely an unsecured
creditor trying to take property by reclassifying it as an improvement or fixture. Landlord’s attorney
countered that there was no evidence that MTI owned anything on the Premises:
[Mr. Lee]: Mediacopy, Inc., is a California corporation. It’s in bankruptcy at the
time. Mediacopy sends a letter or estoppel certificate to the landlord’s lender that
says, I am the only one allowed in the place. I’m the only one in possession.
 
Mr. -- the lease has a specific provision that says if you want to assign the lease or
sublease it to someone, you have to get my permission. He never gave his
permission. It’s his absolute right to assume it’s Mediacopy Copy [sic], Inc., in that
building. He would have no way of knowing it’s Mediacopy Texas. He had a lease
with Mediacopy Texas, for a different company, but it’s for a different property. 

Judge Chew asked counsel for the Receiver “to address particularly the argument . . . concerning
Mediacopy versus Mediacopy Texas”:
[The Court]: And now we have Mediacopy Texas, Inc., as being actually in the
building, how those entities are connected, if they are connected.
 
[Mr. Slavin]: And they are, Your Honor. . . . The parties to the receivership were
Mediacopy Texas, Inc., and Infodisk [sic] Global Holding, Inc. 

* * * * *
 
[Mr. Slavin]: If you will go to tab 46 of what was filed by the landlord. . . . You’ll
see that it’s from Infodisk [sic] Global Holdings, Inc., a wholly owned subsidiary of
Infodisc Technology Company, Limited, d/b/a Mediacopy, a California corporation. 
So Infodisk Global Holdings, Inc., is a party to this receivership, is a party that was
placed in receivership. It is d/b/a Mediacopy, Inc., and they set up Mediacopy Texas
because of the Texas operation involved in its holding operation.

 At this same hearing, the court addressed “the fixtures issue.” 
 
[The Court]: Okay. This is what I’m going to do. I’m going to make the best effort
to go through these and see if I can -- if you will -- and make a determination of what
I think is -- what I believe to be a trade fixture versus the tenant improvement. 

The parties briefed for the court the distinction between leasehold improvements, which become a
permanent part of the premises, and trade fixtures, which belong to the tenant. After reviewing the
evidence, pleadings and legal arguments, the trial court entered its order determining ownership of
the disputed assets. Proceeds from the sale of those assets totaled $16,550. 
The Jury Trial
            At trial, the Receiver, ICBC and Landlord stipulated to a Premises clean-up charge of
$12,551.58 as an administrative priority claim. The parties also debated both expert and lay
testimony concerning damages for repairs. Landlord designated Bill Means as an expert on repair
costs. Following Daubert


 hearings, the trial court struck Means as an expert. Ayoub was eventually
allowed to give lay testimony that the cost to repair damages to the Premises was $6,200,000. This
testimony was admitted over multiple objections from the Receiver and ICBC. The trial court
submitted Landlord’s quantum meruit claim for rent and repairs to the jury. It refused to submit
proposed issues related to the personal liability causes of action (those dismissed by the prior partial
summary judgment and those added right before trial) and issues related to ownership and value of
the assets sold at liquidation. 
            The jury returned a verdict denying Landlord’s claims for rent and finding that the reasonable
cost of necessary repairs to the Premises caused by the Receiver totaled $3,500,000. Judge Chew
granted judgment non obstante veredicto on the repair claims. From the receivership estate, the trial
court awarded an administrative priority claim to Landlord in the sum of $16,550.00 for assets sold
and $12,551.58 for cleaning charges based on the stipulation of the parties at trial. From this
judgment, Landlord appeals, bringing twenty-five issues grouped into six categories. 
SUBJECT MATTER JURISDICTION
            As we have noted, Mediacopy, Inc. filed for bankruptcy protection on October 22, 2004. 
Landlord, a creditor, received no notice of the California lawsuit filed by ICBC against MTI and
Infodisc Global. It did not receive notice of the California receivership order, nor did it receive prior
notice of the Texas ancillary receivership.
            Standing is implicit in determining subject matter jurisdiction. Crane v. Richardson Bike
Mart, Inc., 295 S.W.3d 1, 3 (Tex.App.--El Paso 2009, no pet.). Consequently, standing cannot be
waived and may be raised sua sponte by an appellate court. Id. at 4; Houston Pipeline Company LP
v. Bank of America, N.A., 213 S.W.3d 418, 429 (Tex.App.--Houston [1st Dist.] 2006, no pet.). We
must first consider whether the bankruptcy stay was violated to determine whether we have
jurisdiction to hear this appeal. Id.
Bankruptcy Stay
            The filing of a bankruptcy petition operates as an automatic stay from “any act to obtain
possession of property of the estate or of property from the estate or to exercise control over property
of the estate,” or “any act to create, perfect, or enforce any lien against property of the estate.” 
Houston Pipeline, 213 S.W.3d at 424, quoting 11 U.S.C.S. § 362(a)(3), (4). The Bankruptcy Code
defines property of the estate broadly to include “all legal or equitable interests of the debtor in
property as of the commencement of the [bankruptcy] case.” Houston Pipeline, 213 S.W.3d at 424,
quoting 11 U.S.C.S. § 541(a)(1). The automatic stay is intended to include litigation, lien
enforcement, and administrative proceedings that could affect or interfere with the property
belonging to the bankruptcy estate. Houston Pipeline, 213 S.W.3d at 425. The estate encompasses
possessory and ownership interests in property, including leasehold interests. Id. at 246. Mediacopy,
Inc.’s leasehold interest in 1390 Don Haskins thus belonged to the bankruptcy estate.
            Section 362(a)(3) stays “any act to obtain possession of . . . or to exercise control over
property of the estate” and applies to “any action, whether against the debtor or third-parties, to
obtain possession or to exercise control over property of the debtor.” Houston Pipeline, 213 S.W.3d
at 427, quoting A.H. Robins Co., Inc. v. Piccinin, 788 F.2d 994, 998 (4th Cir. 1986)(emphasis in
original). The 4th Circuit specifically noted that any action in which the judgment may diminish an
asset of the bankruptcy estate is unquestionably subject to the stay. A.H. Robins 788 F.2d at 1001. 
             “Creditors ‘are clearly parties in interest under the meaning of the Bankruptcy Code [when]
they have a pecuniary interest that was adversely affected’ by a postpetition transfer of property.” 
United States v. Miller, No. Civ. A. 5:02-CV-0168-C, 2003 WL 23109906, at *6-7 (N.D.Tex.
Dec. 22, 2003), quoting In re Reserves Dev. Corp., 78 B.R. 951, 957 (W.D. Mo. 1986).
Without [the automatic stay], certain creditors would be able to pursue their own
remedies against the debtor’s property. Those who acted first would obtain payment
of the claims in preference to and to the detriment of other creditors. Bankruptcy is
designed to provide an orderly liquidation procedure under which all creditors are
treated equally. A race of diligence by creditors for the debtor’s assets prevents that.

Checkers Drive-In Rests., Inc. v. Comm’r of Patents & Trademarks, 51 F.3d 1078, 1082 (D.C.Cir.
1995), quoting S.Rep. No. 989 at 49, 95th Cong., 2d Sess. 54 (1978), reprinted in 1978
U.S.C.C.A.N. 5787, 5835, H.R.Rep. No. 595, 95th Cong. 2d Sess. 340 (1977), reprinted in 1978
U.S.C.C.A.N. 5963, 6297).
Analysis
            We are persuaded by the analysis in Houston Pipeline. 213 S.W.3d 418. Houston Pipeline,
once a subsidiary of Enron, sold natural gas to the Bammel Gas Trust. Bank of America provided
the loan for the purchase. Thereafter, Enron sold Houston Pipeline to AEP Energy Services and the
Bammel Trust released Houston Pipeline’s liabilities from the first sale. The Trust then leased
natural gas in the Bammel Reservoir to BAM LeaseCo, another Enron subsidiary, but Houston
Pipeline still retained the rights to use the natural gas--referred to in the opinion as “Storage Gas”
--in the Bammel Reservoir. A few months later, Enron, LeaseCo, and other Enron affiliates filed
for bankruptcy. The Bank filed suit in state court contending that Houston Pipeline’s right to use
the Storage Gas was subject to the Bank’s security interest. The trial court concluded that the Bank
had a first priority security interest in the Storage Gas. On appeal, the Bank alleged that the
bankruptcy stay was not violated because (1) only Enron had the right to claim the stay, (2) the
judgment did not affect the Enron bankruptcy estate, and (3) the stay was subsequently lifted such
that the issue was moot. The appellate court disagreed. The court found that because LeaseCo – a
debtor in the Enron bankruptcy--had possessory and ownership interests in the Storage Gas, it
constituted property of the LeaseCo bankruptcy estate and was subject to the automatic stay. Id. at
425-427. The trial court’s determination affected estate property because it prevented Houston
Pipeline from asserting an interest in the Storage Gas in the bankruptcy court. Id. at 428. By
excluding an interested third party--Houston Pipeline--the trial court erroneously exercised control
over the Storage Gas. Id. A determination of which party held a superior interest in the Storage Gas
was a necessary prerequisite to the Bank’s settlement agreement with Enron in bankruptcy court. 
Id. Indeed, the court concluded that the declaratory judgment action itself was an act by the Bank
to control property of the estate in violation of the automatic stay. Houston Pipeline, 213 S.W.3d
at 428. We adopt that same reasoning here.
Void Order
            An action taken in violation of the automatic stay is void, not voidable. Continental Casing
Corp. v. Samedan Oil Corp., 751 S.W.2d 499, 501 (Tex. 1988). If a judgment is void because the
trial court lacked jurisdiction, we must vacate the judgment and dismiss the case. Tex.R.App.P.
43.2(e).
            We readily acknowledge that Landlord did not directly challenge the trial court’s jurisdiction. 
Nevertheless, Landlord’s status as a creditor of Mediacopy, Inc. is not disputed and thus did not need
to be separately challenged. Houston Pipeline, 213 S.W.3d at 431 (Houston Pipeline’s status as a
creditor of LeaseCo was clearly ascertainable from the record and did not need to be separately
asserted). In any event, Landlord vehemently and repeatedly claimed that its property was being
removed and sold. In addition to their petition in intervention seeking a temporary restraining order,
Landlord filed a motion to vacate and terminate the ancillary receivership, complaining of lack of
notice and hearing. As late as the hearing on the ownership of the fixtures, Landlord continued to
press its point:
[Mr. Lee]: Okay. I was not involved in June of ‘05, but if we go back to what was
going on at that time, there was an auction proceeding and we tried--Mr. Haugland
tried three separate times before the injunction, I think, a couple of times by letter to
try and stop it. Couldn’t stop it, filed an injunction, complained every day that the
things that belonged to us were being sold and provided information about that.

* * * * *
 
The man owns a company, Judge, and I don’t really know how to put it any better
than this: It would be like if a court sent someone to my living room and said, I’m
here because the guy across the street owes me money. And they said, You’ve got
all of his stuff in here so I’m going to take that stuff and I’m going to go sell it. 
Forget if I want it sold or not. I’m going to go sell it and if it turns out that it didn’t
belong to him, we’ll let you come get the money. That’s what happened in this case. 
That building had nothing to do with the company that you took the receivership out
on.
 
Mr. Ayoub is sitting there trying to figure out why is anyone even coming to my
building? They don’t have a lease. They don’t own any of the equipment, and
there’s not one shred of evidence before you, Judge, that a piece of anything belonged
to Mediacopy Texas, Inc., which is the company you did the receivership for. 

And although the violation of the bankruptcy stay is not assigned as error on appeal, Landlord has
noted these objections in its briefing:
At all pertinent times, Mediacopy was a debtor in a bankruptcy case, styled In re
Mediacopy, a California corporation, and filed in 2004 as case number LA-04-32508-SB on the docket of the United States Bankruptcy Court for the Central District of
California, Los Angeles division [record citation deleted]. As a result of the
automatic stay in bankruptcy proceedings, neither the trial court nor Evans had any
jurisdiction or right to act with respect to Mediacopy or any of its assets at any time. 

            As in Houston Pipeline, a determination of which party held a superior interest in the
improvements/fixtures/trade fixtures was a prerequisite to ICBC’s agreement with MTI and Infodisc
Global to liquidate all of the assets. This is particularly true since the Receiver took possession of
Landlord’s premises and sold its assets. 
CONCLUSION
            Mediacopy, Inc. was in bankruptcy (1) at the time ICBC filed suit in California, (2) at the
time of the California receivership order, (3) at the time the request for ancillary receivership was
filed in Texas, (4) at the time of the Texas ancillary receivership order, (5) at the time of the auction
and liquidation, (6) and at the time of the California default judgment in ICBC’s favor. That the
bankruptcy was later dismissed is of no moment. Houston Pipeline, 213 S.W.3d at 431 (subsequent
lifting of the stay does not render the issue moot because the trial court entered the judgment when
it did not have jurisdiction). While we recognize that years of litigation have been for naught, the
parameters of our jurisdiction are clear. We vacate the judgment of the trial court and dismiss the
case. 

May 28, 2010                                                                                                                                                  ANN CRAWFORD McCLURE, Justice

Before McClure, J., Rivera, J., and Guaderrama, Judge
Guaderrama, Judge, sitting by assignment